Chris A. STILES, Plaintiff,

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

No. 4:02–CV–90537.

United States District Court,
S.D. Iowa,
Central Division.

April 24, 2003.

Kenneth A. Johnsen, Esq., Des Moines, IA, for Plaintiff.

Christopher D. Hagen, Esq., Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Chris A. Stiles, filed a Complaint in this Court on October 16, 2002, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability benefits and Supplemental Security Income benefits on August 14, 2000. Tr. at 113–15 & 320–22. Plaintiff claimed to have become disabled January 1, 2000. Tr. at 113. Plaintiff is insured for Title II benefits through September of 2000. Tr. at 120. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on December 19, 2001. Tr. at 36–94. The ALJ issued a Notice Of Decision—Unfavorable on May 21, 2002. Tr. at 11–22. After the decision was affirmed by the Appeals Council on August 10, 2002, (Tr. at 7–9), Plaintiff filed a Complaint in this Court on October 16, 2002.

## MEDICAL RECORDS

Plaintiff was seen at the Mercy Ankeny Medical Clinic[1] on July 22, 1998. His complaints involved an inability to relax, depression and feelings of doom. Plaintiff said that he was an apartment manager which involved a lot of stress. He denied alcohol or drug use. Plaintiff was given a prescription of Prozac. Tr. at 204. When Plaintiff was seen on August 1, 1998, he had been fired from his job as an apartment manager. He felt that being fired was a good thing because of the stress of the job. He reported that the depression was markedly improved. The prescription for Prozac was continued. Tr. at 203. On September 8, 1998, Plaintiff reported that he was having mood swings and bouts of depression to a moderate degree. The doctor wrote that Plaintiff had dyed his hair reddish brown and that his contact lenses were artificial blue. Plaintiff's medication was changed to Effexor. Tr. at 202. On September 22, 1998, Plaintiff was doing well on the Effexor, but he reported that he had been on a drinking binge the previous weekend. Plaintiff asked for a referral for some counseling and was sent to Mercy Franklin for an evaluation and treatment.

On October 8, 1998 (Plaintiff's birth date is October 8, 1956), Plaintiff had been

---

1. The doctor who saw Plaintiff is not identifiable from the treatment notes which are discussed here and below. At the hearing, however, Plaintiff testified that he saw Nancy Akins, D.O. at the Mercy Clinics. Tr. at 49.

drinking heavily and was taking extra doses of Prozac and Effexor. Plaintiff had been found in a stuporous condition. Plaintiff's wife was told to take him to the emergency room. Tr. at 201. *See also,* Tr. at 199 which is the emergency department report dated October 8, 1998. On December 16, 1998, it was noted that Plaintiff had been through a 25 day detox. program. During the detoxification process, Plaintiff had been taken off his medication which made him feel anxious and depressed. Plaintiff was described as being very calm and not disheveled as he had been in the past. Tr. at 200.

When Plaintiff was seen at Mercy Ankeny Clinic on March 12, 1999, for sinus problems, the doctor was concerned about Plaintiff having a flare up of major depression. Tr. at 216. April 8, 1999, Plaintiff saw the doctor for "a long standing history of a leg injury secondary to a motor vehicle accident dating back to 1978." The doctor wrote that Plaintiff had orthopedic wiring installed at the injury site a piece of which was protruding through the surface of the skin. The doctor performed a surgery to remove the wire. The doctor also increased the dosage of the antidepressant medication. Tr. at 215.

Plaintiff was hospitalized at Iowa Lutheran Hospital from August 13 to 17, 1999. He had been admitted for treatment of alcohol abuse and suicidal ideation. Plaintiff had been drinking at least a 12–pack of beer a week. Plaintiff had been thinking of jumping off a bridge. On discharge, James Kim, M.D. diagnosed major depression and alcohol abuse. Tr. at 205. During the admission history, it was noted that Plaintiff had undergone alcohol treatment in 1993. He had about a 12 year sobriety period until a divorce from his first wife. Under the heading of Family History the following is written: His father was murdered in 1983. His mother went to jail as accomplice and charged with second degree murder. Tr. at 207.

When Plaintiff was seen on September 22, 1999 at the Mercy Ankeny Clinic, he complained of low back pain. The doctor performed soft tissue manipulation of the cervical, thoracic and lumbosacral regions of the back. Tr. at 212. A note dated December 1, 1999, states that Plaintiff had undergone sinus surgery on October 29, 1999. Tr. at 209. On January 24, 2000, Plaintiff reported that he had been out of Wellbutrin for a few days and, as a result, was feeling grumpy and short tempered. Plaintiff also complained of gastroenteritis symptoms of nausea and vomiting. Plaintiff was given a prescription for Wellbutrin and advised to call Dr. Kim, his psychiatrist, for further prescriptions. Tr. at 249.

A Mercy Ankeny Clinic progress note dated May 3, 2000, states that Plaintiff was seen for significant depression. Plaintiff reported that he wanted to return to work, but that his depression would not allow it. "He has had bouts of anger, cannot sleep, cannot function, negative thoughts frequently." Plaintiff asked for and was given a referral to the Mercy Franklin clinic. First on a list of six diagnoses was poorly controlled major depression. Tr. at 243.

Plaintiff saw Ian Lin, M.D. at Des Moines Orthopaedic Surgeons on August 7, 2000. Plaintiff was walking awkwardly because of his leg injury and complained of back pain as well as more pain in his leg. Plaintiff's left leg was 1¾ inches shorter than the right. X-rays showed the healed injury. Tr. at 232. After his examination, the doctor diagnosed malunion distal third mid third junction tibia fracture. Tr. at 233.

A consultation report dated August 19, 2000, by Mark Smolik, M.D. states that Plaintiff had recently undergone a repair of a left inguinal hernia. Plaintiff was complaining of pain for which the doctor

prescribed additional medication. Tr. at 237.

On October 4, 2000, Plaintiff saw Dr. Akins. Plaintiff was examined because of his back pain which the doctor said was caused from his short leg syndrome. Plaintiff was using a cane when he walked. In addition, Plaintiff appeared to be depressed. Dr. Akins told Plaintiff to discontinue Wellbutrin and to begin taking Serzone. Tr. at 234.

Plaintiff underwent a consultative psychiatric evaluation by Ashwini A. Pradhan, M.D. on November 13, 2000. Tr. at 250–54. Plaintiff said that in 1978, while stopped at a stop sign on a motorcycle, he was hit from the rear by a 18–year–old driver who was under the influence of alcohol. Plaintiff's best friend who was riding with him, was killed. Plaintiff was thrown 80 feet and sustained fractures of his left ankle for which he underwent two or three surgeries. Plaintiff was on disability for five years but returned to work after he began to feel better. He reported that since January of 2000, the pain in his ankle had been almost constant and, because of his limp, he was experiencing low back pain. He said the back pain was dull and that it became sharp with movement. Plaintiff said that he was unable to do any activity for more than an hour at a time after which he needs to lie down. Tr. at 250. Plaintiff said that the pain interferes with his ability to sleep. Often he is unable to get to sleep until after 3:00 a.m., can sleep for three or four hours, and then is tired and sleepy throughout the day. Plaintiff told the doctor that his depression began at the time of a divorce from his first wife. The doctor wrote: "He described his overall depression as thinking about suicide all the time, feeling very hopeless about his condition, always feeling negative, never positive, feels guilty because he is not able to make money, he is not able to have even normal activities.

Patient stated that the depression is getting so bad that now he is afraid that he will come very close to hurting himself, but then he said that he will try to talk to his mother, his kids, etc., and avoid committing suicide." Plaintiff said that two of his wife's "so-called ex boyfriends" live in the same house with him and his wife. He said that his daughter got pregnant when she was 14, so that child is being raised by her grandmother. Tr. at 251. Plaintiff said that his daily activities consist mostly of watching TV and some reading. He said that from time to time, he must lie down because of his back pain. Once a week he goes to the store with his wife, and once a week they go to visit his mother. Plaintiff said that he does no household chores other than washing his dishes after lunch. Dr. Pradhan observed that after about 45 minutes, Plaintiff showed obvious physical distress and needed to change position frequently. On mental status examination, while he had no problems with simple calculations, he was unable to do serial sevens. Tr. at 253. Dr. Pradhan's Axis I diagnosis was depressive disorder NOS. In conclusion, the doctor wrote: "He should be able to understand the simple instructions, procedures and locations, and even remember them, but he is not capable of maintaining attention, concentration and definitely pace for more than one or two hours. He should be able to get along with co-workers, but he is not capable of handling changes in his working situation..." Tr. at 254.

Plaintiff saw Dr. Kim at a frequency of approximately once per month between March 16 and November 30, 2001. Tr. at 301–03 and 315–18.

After Plaintiff saw Dr. Pradham, Philip Walls, M.D., a psychiatric consultant, reviewed Dr. Pradhan's report as well as Dr. Kim's treatment records. Dr. Walls wrote that it appeared to him that the treatment

Plaintiff was receiving was not consistently effective, and that the consultative examination had revealed "significant limitations." Tr. at 266. On a Mental Residual Functional Capacity Assessment form, Dr. Walls opined that Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods. Tr. at 264. The ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to preform at a consistent pace without an unreasonable number and length of rest periods was also markedly limited. Tr. at 265. Dr. Walls also found that Plaintiff was moderately limited in his ability to perform activities within a schedule; maintain regular attendance, and to be punctual within customary tolerances; to sustain an ordinary routine without special supervision (Tr. at 264); to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors. Dr. Walls found that Plaintiff's ability to respond appropriately to changes in the work setting was limited to a moderate to marked degree. Tr. at 265. Based upon this assessment of Plaintiff's limitations, Disability Determination Services found that Plaintiff was disabled as of January 1, 2000. Tr. at 95. When the case was reviewed at the Quality Assurance Unit in Kansas City, Missouri, however, it was determined that the restrictions found by Dr. Walls were not supported by the evidence in the record. The case was sent back to the Iowa agency for further development and review. Tr. at 283–92. David A. Christiansen, Ph.D. completed a Mental Residual Functional Capacity Assessment form on April 2, 2001. On this form, none of the domains were checked markedly limited. The following domains were listed as moderately limited: The ability to maintain attention and concentration for extended periods of time; the ability to perform activities within a schedule, main-

tain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision (Tr. at 294); the ability to complete a normal workday and workweek, etc; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. Tr. at 295. All other domains were listed as not significantly limited.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on December 19, 2001. Tr. at 36–94. Plaintiff testified that his past work had consisted of painting the insides of new houses. Tr. at 44. Plaintiff said that the accident which resulted in his short leg syndrome happened when he was about 19 years old. He said that after the accident, he received disability benefits for about five years. Tr. at 47. Plaintiff said that he has pain in his back, left leg, ankle and sometimes his knee. Tr. at 48. He said that at the Mercy Clinics, he sees Dr. Akins. Tr. at 49. Plaintiff testified that Dr. Akins has prescribed medication for his depression as well as his pain. Dr. Akins also referred Plaintiff to the specialists he had seen. Tr. at 50. He said that the medication dulls the pain and makes him sleepy. Tr. at 51. Plaintiff said that he can stand about 10 minutes before he needs to sit down. He said that he can walk about 150 feet, and that his doctor had given him a handicapped parking sticker. After sitting for 20 to 30 minutes, he gets burning and tingling and sharp pain in his legs. Tr. at 52. Plaintiff said that he uses a cane to help balance himself while walking. Plaintiff said that he does not lift more than five pounds and did not think he could do that with any frequency. Tr. at 53.

Plaintiff testified that he had trouble with depression for about 4 years. Plaintiff sees both Dr. Akins and Dr. Kim for the depression. He said that antidepressant medication is beneficial for a time, after which it loses effectiveness. Tr. at 56. He said that the medication keeps him in a stupor and affects his sex drive. Tr. at 57. When he is depressed, Plaintiff said he has a feeling of doom and that he prefers to be alone. Tr. at 58. Plaintiff said that a big problem with depression is motivating himself to do anything, including activities of daily living. Tr. at 59. Plaintiff said that he was taking medication for audio hallucinations which was effective. Tr. at 61.

When asked about daily activities, Plaintiff said he spends most of his time trying to be pain free. He said that he frequently changes position from sitting to laying down. He said that his wife does all the house work. Tr. at 63. Plaintiff estimated that he spends 30 to 40 percent of his time lying down. Tr. at 64.

The ALJ asked Plaintiff if he could pick up a 10 or 20 pound sack of potatoes and carry it across a room. He said that he could if he didn't have to bend over for it. Tr. at 75. Plaintiff said that he has noticed problems with his short term memory since the onset of the depression. Tr. at 76. Plaintiff told the ALJ that since he had undergone treatment for alcoholism, he had not drank or used drugs. Tr. at 77.

After Plaintiff testified, the ALJ called Marian Jacobs to testify as a vocational expert. Tr. at 81. The ALJ asked the following hypothetical:

My first assumption is that we have an individual who is 45 years old. He was 43 years old as of the alleged onset date of disability and the date last insured for Title II benefits. He's a male. He has a high school education and past relevant work as you've indicated in Exhibit 18E (Tr. at 197[2]). And he has the following impairments. He has short-leg syndrome, status post history of open reduction and internal fixation of the left lower leg, sinusitis, medically determinable impairments resulting in complaints of low back pain and numbness of the legs, major depressive disorder and a history of substance abuse. As a result of a combination of those impairments and medication or other treatment prescribed for those impairments he has the residual functional capacity as follows. He cannot lift more than 20 pounds, routinely lift 10 pounds. No standing of more than 60 minutes at a time. No walking of more than 60 minutes at a time. No continuous stooping. No repetitive squatting, crawling or climbing. This individual is not able to do very complex or technical work, but is able to do more than simple routine repetitive work, which does not require constant attention to detail. He does require occasional supervision. He should not work at more than a regular pace. And that's using three speeds of pace, being fast, regular and slow. And he should not work at more than a mild to moderate level of stress. Would this individual be able to perform any job he previously worked at either as he performed it or as it is generally performed within the national economy, and if so, would you please specify which job?

Tr. at 85–86. In response, the vocational expert testified that Plaintiff would not be able to do his past work. Tr. at 86. The vocational expert said that Plaintiff's knowledge of painting materials and the purchasing of those materials would provide him with skills transferable to jobs

---

**2.** The ALJ announced from the bench that the job of apartment manager was not to be considered part of the past relevant work. Tr. at 84.

such as order filler in a paint supply store. Tr. at 87. In addition, the vocational expert testified that the hypothetical would allow for performance of a wide range of unskilled work such as laundry folder, assembler of small products[3], and housekeeping cleaner. Tr. at 88.

The ALJ asked a second hypothetical question:

> ...This individual would have the residual functional capacity as follows. He could not lift more than 15 to 20 pounds, routinely lift five to ten pounds. No standing of more than 10 minutes at a time. No sitting of more than 20 to 30 minutes at a time. And no walking of more than 150 feet at a time, with no more than occasional bending, stooping, squatting, kneeling, crawling, or climbing. This individual should not work at unprotected heights or around hazardous moving machinery. He should not be exposed to more than moderate levels of dust, fumes or smoke. He is able to do only simple routine repetitive work, which does not require close attention to detail. He should have no more than occasional contact with the public, coworkers and/or supervisors. However, he does require occasional supervision. He should not work at more than a regular pace. And he should not work at more than a mild to moderate level of stress.

Tr. at 88–89. In response to this question, the vocational expert testified that such a person would not be able to engage in work activity at any level. Tr. at 89–90. In response to questions from Plaintiff's counsel, the vocational expert testified that if Plaintiff were not able to maintain atten-

tion and concentration for more than one or two hours a day, he would not be able to work on a full time basis. Tr. at 91. The vocational expert testified that if an individual missed more than three days of work each month, that individual would not be able to maintain competitive employment. Tr. at 92.

## ADMINISTRATIVE DECISION

In the decision dated May 21, 2002, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after January 1, 2000. At the second step, he found that Plaintiff's severe impairments are short leg syndrome and left leg numbness with past surgery to correct left lower leg fractures, sinusitis, allegations of medically determinable impairments resulting in complaints of lower back pain, major depressive disorder, and a history of substance abuse. At the third step, the ALJ found that none of Plaintiff's severe impairments meet or equal any listed in Appendix I, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is unable to perform his past relevant work[4]. At the fifth step of the sequential evaluation, the ALJ found, first of all:

> The claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds. (20 C.F.R. § 404.1567 and 416.967). He can sit/stand or walk for up to 60 minutes at a time. The evidence supports a finding that from the

---

**3.** The vocational expert later said that this job would not be appropriate due to the fact that it required more than a regular pace. Tr. at 90.

**4.** The decision states that Plaintiff is unable to do his past work as a laborer, driver or weld-

er. Plaintiff's past work, however, was that of a house painter. This is obviously a clerical error which escaped notice and which, in this case, constitutes no more than harmless error.

alleged disability onset date of January 1, 2000, the claimant's capacity for light work was diminished by significant limitations in that he can not do continuous stooping and he can not repetitively squat, crawl or climb. The claimant is able to do more than simple, routine, repetitive work, but he is unable to do very complex-technical work. The work should not require constant attention to detail, and should allow for occasional supervision. He can not work at more than a regular pace, or more than mild to moderate stress.

Tr. at 21. Also, at the fifth step, the ALJ found that Plaintiff is able to do the work identified by the vocational expert at the hearing. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 22.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted).

*Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

In the case before the Court, the ALJ found that Plaintiff is unable to do any of his past relevant work. The burden of proof, therefore, shifted to the Commissioner to prove that Plaintiff retains the residual functional capacity to perform other work as well as proving that other work exists in significant numbers in the national economy that can be done by a person with such a residual functional capacity. *Shontos v. Barnhart,* 322 F.3d 532, 540 n. 8 (8th Cir.2003) citing *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (en banc); *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000).

In the case at bar, the ALJ found that Plaintiff has a physical residual functional capacity for lifting 20 pounds occasionally, and 10 pounds frequently along with "significant limitations" which prohibit his ability to stoop, squat, crawl or climb. The ALJ also found that Plaintiff can sit/stand or walk for up to 60 minutes at a time. Although the ALJ is to determine the residual functional capacity on the basis of all the evidence, residual functional capacity is a medical question which must be supported by some medical evidence. *See, e.g., Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001), and cases cited therein. In the case at bar, Plaintiff's left leg is 1¾ inches shorter than his right leg because of the injuries sustained in the motorcycle accident. After his disability benefits were terminated in the early 1980s, Plaintiff worked as a painter until he was pre-

vented from doing so by back pain and by depression about which more will be said later. Plaintiff sought medical care for his back pain from his family physician who referred him to an orthopaedic doctor. Dr. Akins wrote that Plaintiff's back pain was caused by his inability to walk correctly because of the short left leg. Plaintiff took pain medication. No other treatment was prescribed. Plaintiff testified that he needed to lie down frequently throughout the day to relieve his back pain. Plaintiff testified that he can stand only about 10 minutes and that he can only walk 150 feet. He said that after 20 or 30 minutes of sitting, he gets burning, tingling and sharp pain in his legs. This testimony was indirectly corroborated by the observations of Dr. Pradhan who wrote that after about 30 minutes Plaintiff was in obvious physical distress and needed to change position frequently. The Court can find no medical evidence which supports the ALJ's finding of Plaintiff's physical abilities. At a minimum, the ALJ should have obtained a consultative examination or submitted interrogatories to Plaintiff's treating physicians to determine Plaintiff's ability to function in the real world of work. *See Lauer* at 704, citing *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000)(the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace). *See also, McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)(the residual functional capacity which must be found is the ability to engage in the requisite physical acts day in and day out in the competitive and stressful conditions in which real people work in the real world). Likewise, *simply finding some or all of the claimant's testimony not credible does not satisfy the Commissioners burden. Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993) (drawing a conclusion regarding credibility is not equivalent to proving residual functional capacity by medical evidence).

It is the opinion of the Court that if Plaintiff's only impairment were the short leg syndrome, the proper remedy would be to remand the case to determine if Plaintiff is able to do light or sedentary work and whether such work is available. Plaintiff, however, also suffers from severe depression and the record is fully developed in this respect. The best medical evidence of the effects of Plaintiff's depression is the well written psychiatric report of Dr. Pradhan. Therein, the doctor wrote that Plaintiff is not capable of maintaining attention, concentration, or pace for more than one or two hours per day. The doctor also said that Plaintiff is not capable of handling changes in his work situation. When the vocational expert was asked to consider these limitations, it was her testimony that competitive work was not possible.

▮ It is the opinion of the Court that the ALJ's formulation of Plaintiff's mental limitation—"not able to do complex or technical work, but is able to do more than simple routine repetitive work which does not require constant attention to detail"— does not capture the concrete consequences of a mental impairment such as major depression. *Taylor v. Chater,* 118 F.3d 1274, 1278 (8th Cir.1997) (testimony of a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies). Here, the ALJ's hypothetical tells the vocational expert nothing more than that the claimant cannot do highly technical work but is perfectly capable of doing unskilled or semi skilled work. The medical evidence in this case does not establish that Plaintiff's ability or lack of ability to do complex technical work is the consequence of his depression. Plaintiff has never done complex or technical work. Rather the depression af-

fects his concentration, attention and pace. Dr. Akins wrote that Plaintiff's depression results in bouts of anger, inability to sleep, inability to function and frequent negative thoughts. These are the concrete consequences of Plaintiff's depression.

In *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995), Judge Posner wrote that severe depression is not the blues. It is a severe mental illness. Judge Posner cautioned that psychiatrists, not lawyers or judges are the experts in questions about the onset and severity of the illness. It was, therefore, error for the ALJ to disregard the uncontradicted opinion of the psychiatrist and substitute his own lay opinion about how this illness affects Plaintiff ability to work.

■ The vocational expert testified that if the limitations identified by Dr. Pradhan were taken into account, competitive work would not be possible. It is well settled that for vocational expert testimony to constitute substantial evidence, it must be based on hypothetical questions that relate with precision the physical *and* mental impairments of the claimant. *Ness v. Sullivan*, 904 F.2d 432, 436 (8th Cir.1990). The testimony of the vocational expert in response to the ALJ's hypothetical which assumed that Plaintiff's mental impairments did not prohibit work that was less than very complex or technical in nature is not substantial evidence. The findings that Plaintiff has a residual functional capacity for work and that other work exists that Plaintiff can perform, therefore, is not supported by substantial evidence on the record as a whole. However, because there is already expert testimony that the limitations imposed by Plaintiff's depression would eliminate competitive work, there is no need to remand for any purpose other than to award Plaintiff the benefits to which he is entitled. *Taylor*, 118 F.3d at 1279 (remand is not necessary where the record overwhelmingly supports a finding of disability). The Commissioner did not meet her burden on either prong of step 5 of the sequential evaluation. Plaintiff, on the other hand, came forward with substantial evidence in support of his claim of benefits.

## CONCLUSION AND DECISION

■ It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled. This case is remanded for the sole purpose of computing and awarding Plaintiff the benefits to which he is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.