312 F.Supp.2d 1195 (2004)
Sharon QUAITE, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:02CV1954 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 25, 2004.
*1196 Frank J. Niesen, Jr., Niesen Law Office, St. Louis, MO, for Plaintiff.
Deborah L. Golemon, Office Of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security on the application plaintiff Sharon Quaite for a period of disability and disability insurance benefits under Title II and Subchapter XVIII, Part A, of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND

A. Plaintiff's application and medical records
In August 1998, Sharon Quaite applied for benefits, claiming she has been disabled since August 31, 1996. She maintained that depression and personality disorder limited her ability to work by causing weight loss and making her disoriented, tired, confused, unmotivated, and irritable. (Tr. 100-02, 132.)
In July and August 1998, plaintiff underwent psychiatric hospitalization and court-ordered drug and alcohol rehabilitation. In September 1998, she began treatment with Dr. Jose DaSilva at Midwest Psychiatry, where she was diagnosed with depressive disorder not otherwise specified, phobic disorder, borderline personality disorder, and bipolar disorder. By April 1999, he observed her symptoms were under adequate control. On June 7, 1999, Midwest Psychiatry staff noted that her mood "for the most part" was "o.k." Her appetite and sleep were okay, although she still reported some irritability and feeling hopeless. (Tr. 183-89, 191-269, 286-90, 298-301.)
On June 9, 1999, F. Timothy Leonberger, Ph.D., conducted a consultative psychological examination. He noted that plaintiff appeared to have gone through a period of major depression with psychotic features during the previous summer. Summarizing test results, he noted that her performance of Trail Making Tests A and B indicated that she had no cognitive deficits. As to personality functioning, he noted that Beck Depression Inventory testing indicated that she was currently moderately depressed, while Minnesota Multiphasic Personality Inventory (MMPI) testing indicated mild and chronic depression and social introversion. Based on a review of plaintiff's clinical history, mental status, and current test results, he indicated, as relevant, the following diagnoses: a history of major depression with psychotic features, dysthymic disorder, and anxiety disorder not otherwise specified; personality disorder not otherwise specified with dependant and borderline features; and a current Axis V Global Assessment of Functioning (GAF) of 50. (Tr. 291-96.)
Addressing the issue of functional limitations, Dr. Leonberger noted plaintiff was able to take care of most of her activities, i.e., cleaning her home, cooking, and driving, but handled finances and shopped with her husband. Thus, he concluded that she had only mild impairment in activities of daily living. Next, he noted that she was depressed and socially withdrawn, had few friends, and was anxious in most social situations. He therefore concluded that she had moderate to marked impairment in social functioning. Because her general health was good such that she should not have difficulties with persistence and pace *1197 on most jobs unless it was depression related, and her concentration and memory might be mildly to moderately affected by anxiety and depression, he next concluded that she had a mild to moderate impairment in concentration, persistence, and pace. In addition, noting that she was trained as a hairdresser, had functioned for five years at that position, and appeared to be stable on her current medication, he concluded that she had moderate impairment in deterioration or decompensation in work or work-like settings. Finally, under the heading "Statement of Capacity," he opined that she "is capable of handling funds in her own best interest." (Tr. 295-96.)

B. The hearing testimony
At the hearing before the Administrative Law Judge (ALJ) on May 20, 1999, plaintiff testified to the following. She earned a GED, completed beauty school, had some college education, and was working toward a nursing degree. She lives with her husband and their four children, including a six year-old son with Down Syndrome. When he was born, however, she stopped attending college. She also had five children from a previous marriage. She last worked in 1996 as a full-time school bus driver and earned $6,000, but quit to care for her children. In 1990, after receiving x-rays at a vocational rehabilitation clinic, she was diagnosed with arthritis in the shoulders. It did not prevent her from driving the bus. (Tr. 32-34, 39, 57.)
She went part-time to a community college for hotel/restaurant management and culinary arts starting in the fall of 1997 but, having depression problems, she stopped attending the next spring. She was not on medication and had no doctor at the time. (Tr. 51-52.)
Her psychiatrist, Dr. DaSilva, prescribed Depakote and Hydroxy for her depression. She sees him monthly for medication but not counseling. Her depression makes her lose interest in things. Stress contributes to her depression. (Tr. 34-35, 50-51.)
The previous summer, her gynecologist prescribed hormone pills and told her she was not depressed. Her priest sent her to the Metropolitan Psyche Center. On July 7, 1998, she went to St. John's emergency room, but it would not take her. She returned on July 13, but was sent to the psyche center, where she signed herself in. She was then sent to Archway for nine days. (Tr. 53-54.)
Her symptoms before going into the hospital were paranoia, fear of leaving the house or going out alone, hearing voices, and thinking she was allergic to the drug Paxil. She heard her exhusband's voice telling her she was stupid and heard an unidentified voice tell her to kill herself. She had had thoughts of suicide, but those thoughts ceased. (Tr. 61-62.)
She gets up at 6:00 a.m. daily but often goes back to sleep until the children wake at 9:00 a.m. She then makes them breakfast and conducts learning activities. She lays on the couch in the afternoon. Her husband's sixteen year-old son goes to school half a day; for four months prior to that he stayed at home and helped care for her kids and with chores. She home-schools her Down Syndrome son, but he would go to school in the fall. Sometimes she must take care of his personal needs, e.g., assist him in the toilet. (Tr. 32, 41-42, 44, 48-49.)
She can drive a car but does not have one at her disposal regularly. She gets in the car and leaves the house about twice a week. She never leaves the house without accompaniment. She occasionally attends church. She takes her children to the park. Her husband takes her grocery shopping. She has no hobbies and does no gardening. (Tr. 42-44, 47-48, 62-63.)
*1198 She is 5 feet 2 inches tall and weighs 140 pounds. She gained thirty pounds in the past year. She can lift twenty to thirty pounds. Her father had a problem with alcohol. She was abused as a child. Her first husband mentally abused her. Her prior residence burned down on February 22, 1999.
In September 1998 she slept much more and did not get much done after leaving the hospital. She has no medical insurance but pays medical bills through a City grant. She cannot work because it is hard for her to concentrate and she has to stop working. (Tr. 63, 65-67.)
Plaintiff's husband, Thomas Quaite, testified briefly to the following. The previous summer plaintiff had mood swings, became angry, screamed until her face reddened, and would not cook at regular times. By the date of the hearing, she was doing all of the cooking, doing the dishes, no longer having violent mood swings, and helping much more with the children than before she started seeing Dr. DaSilva. She was also able to sleep "a lot more" since going on medication. (Tr. 68-70.)

C. The ALJ's decision
In an August 9, 1999 decision, the ALJ found the following. Plaintiff has not engaged in substantial gainful activity since August 31, 1996. She has bipolar disorder, a personality disorder, and a history of psychosis but no impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. With respect to the July 1, 1998 to July 1, 1999 period, plaintiff is credible, but her allegations of symptoms precluding all work after July 1, 1999, are not credible.
In enumerated Finding 5 the ALJ specified,
[b]etween July 1, 1998 and July 1, 1999, the claimant could not relate appropriately with other people, use proper judgment, maintain her attention and/or concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. However, after July 2, 1999, the claimant cannot perform simple and repetitive tasks.
(Tr. 20.) In Finding 7 the ALJ stated that plaintiff "has had the [RFC] to perform at least the full range of work beginning July 2, 1999." Based on plaintiff's RFC and vocational factors between July 1, 1998, and July 1, 1999, the ALJ concluded no jobs existed in significant numbers with she could perform. Considering plaintiff's age, education, and work experience, in combination with the range of work at all exertional levels that plaintiff remained functionally capable of performing, and using Appendix 2, Subpart P, Regulations No. 4, § 204.00, as a framework for decision-making, the ALJ found that plaintiff was not disabled as of July 2, 1999. In Finding 14 the ALJ wrote, "[t]he claimant was disabled from July 1, 1998 through July 1, 1999. However the claimant was not disabled after July 2, 1999." Thus, the ALJ decided that plaintiff was only entitled to a closed period of disability benefits. (Tr. 20-21.)

II. DISCUSSION
Plaintiff makes two arguments in her brief. First, she argues that the ALJ's statement in Finding 5, that she "cannot perform simple and repetitive tasks," is inconsistent with Findings 7 and 14. Next, she argues that the ALJ erred in terminating her benefits on July 2, 1999, because termination was contrary to the evidence, namely Dr. Leonberger's evaluation. (Doc. 12 at 8-11.)
The court's role on review is to determine whether substantial evidence in the record as a whole supports the Commissioner's findings. See Krogmeier v. *1199 Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920[1]; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003).
Turning to plaintiff's arguments, the court first concludes that the ALJ's statement that plaintiff "cannot perform simple and repetitive tasks" is a mere typographical or clerical error and does not warrant reversal. When viewed in the context of the other portions of Finding 5, as well as Findings 7 and 14, which indicate that plaintiff had the RFC to perform the full range of work after July 2, 1999, it is clear that the second sentence in Finding 5 was intended to read that, after July 2, 1999, plaintiff "can" perform simple and repetitive tasks. See Parker v. Apfel, 998 F.Supp. 1070, 1075 n. 2 (E.D.Mo.1998) (in the "context of the decision," the ALJ's statement that the claimant "is undergoing to further treatment" was clearly a typographical error and should have read that she "is undergoing no further medical treatment"). This meaning is also confirmed upon reading the ALJ's assessment of plaintiff's RFC earlier in the decision, which states that the ALJ "does find that as a result of the claimant's bipolar disorder, she is limited to simple and repetitive tasks."
Although the two cases cited by defendant in opposition to plaintiff's first argument  Lubinski v. Sullivan, 952 F.2d 214, 216 (8th Cir.1991), and Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir.1999) (Doc. 15 at 4)  do not address errors identical to the one present here, those cases are nonetheless persuasive. Moreover, in criticizing defendant's reliance on Lubinski and Senne (Doc. 16 at unnumbered 1-2), plaintiff has not referred the court to any cases addressing what constitutes a typographical or clerical error. Useful case law does exist, however, and the court takes guidance from other cases which ALJ's decisions were upheld despite such errors. See, e.g., Henderson ex rel. Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir.1999) (the ALJ's reference to an exhibit not in the record was nothing more than a typographical error); Stiles v. Barnhart, 258 F.Supp.2d 996, 1002 n. 4 (S.D.Iowa 2003) (in case where the claimant's past work was house painting, the ALJ's finding that claimant was unable to do his past work as *1200 a laborer, driver, or welder was "obviously a clerical error" and constituted no more than harmless error).
The court now turns to plaintiff's second argument and concludes substantial evidence supports the finding that plaintiff's condition had improved to the extent that she had regained the ability to perform substantial gainful activity by July 2, 1999. For example, on June 7, 1999, staff at Midwest Psychiatry noted that her mood was generally okay and that her appetite and sleep were also okay. Moreover, Ms. Quaite testified that plaintiff's functioning had improved in many ways since she got on medication. See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir.2003) (the ALJ's decision was supported by substantial evidence in part because of third-party testimony that the claimant's behavior and attention improved with medication); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir.1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."). In addition, plaintiff testified that she left her last employment as a school bus driver to take care of her children and that she attended college part-time. See Tennant v. Apfel, 224 F.3d 869, 871 (8th Cir.2000) (per curiam) (it was proper to consider part-time college attendance as inconsistent with an alleged disability); cf. Weikert v. Sullivan, 977 F.2d 1249, 1254 (8th Cir.1992) (noting that the claimant did not leave work because of fatigue but because of job dissatisfaction).
Whether the ALJ arbitrarily chose July 2, 1999, as the date plaintiff ceased being disabled is not the relevant issue before the court. See Krogmeier, 294 F.3d at 1022 (so long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently). In fact, the evidence might have supported a conclusion that plaintiff's disability ceased at an earlier date. What the court must decide is whether substantial evidence supports the determination that plaintiff was not disabled on July 2, 1999.
Plaintiff makes much over the fact that Dr. Leonberger assessed her GAF score as 50 and argues that, because his report was the last medical record relating to her ability to function at a job, "it should have been relied on to determine [her] disability." (Doc. 14 at 10.)
The GAF scale is used by clinicians to report an individual's overall level of functioning. See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.2000). A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation ...) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. In the absence of any evidence indicating that Dr. Leonberger assigned this GAF score because he perceived an impairment in plaintiff's ability to work, the score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities. Cf. Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir.2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."); Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered...."). Although Dr. Leonberger's statement of capacity  which addressed only plaintiff's ability to handle funds  could have been more detailed, he certainly did not opine that plaintiff lacked the ability to work.
*1201 The final decision of the Commissioner is affirmed. An appropriate order shall issue herewith.

ORDER
In accordance with the memorandum filed herewith,
IT IS HEREBY ORDERED that the final decision of the Commissioner of Social Security is affirmed. The action is dismissed with prejudice.
NOTES
[1] These Regulations were amended, effective September 25, 2003. See Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations, 68 Fed.Reg. 51,153, 51,163, 55,164 (Aug. 26, 2003).